UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
ATLANTECH INCORPORATED, a      )
Massachusetts corporation      )
                               )
            Plaintiff,         )    CIVIL ACTION NO.
                               )    07-10342-DPW
                               )
        v.                     )
                               )
AMERICAN PANEL CORPORATION,    )
an Arizona corporation, APC    )
ACQUISITION CORPORATION,       )
INC., a Georgia corporation,   )
and UNIVERSAL AVIONICS         )
SYSTEMS CORPORATION, an        )
Arizona corporation,           )
                               )
            Defendants.        )
```

MEMORANDUM AND ORDER
March 6, 2013

Plaintiff Atlantech Incorporated ("Atlantech") and

Defendants American Panel Corporation ("APC"), Universal Avionics

Systems Corporation ("Universal"), and APC Acquisition

Corporation ("APC Acquisition") have presented post-trial motions

to resolve the issues remaining in this case following a jury

verdict in favor of Atlantech.

## I. BACKGROUND

### A.   *Factual Background*

Prior to going out of business in 2008, Atlantech sold

aircraft LCD displays.  Atlantech's main supplier was APC, and

its main customer was Ulyanovsk Instrument Manufacturing Design

Bureau ("UIMDB").  An August 2002 agreement made Atlantech the exclusive vendor to UIMDB, and a December 2003 Non-Circumvention Agreement ("NCA") prevented APC from selling to or soliciting sales from UIMDB for two years after the last time Atlantech and APC completed a transaction or exchanged information.

On December 2, 2003, Universal, through APC,[1] and Atlantech entered into a Memorandum of Agreement for the purchase of 103 1040-100 AMLCD displays ("1040 MOA").[2]  The 1040 MOA incorporated a variety of sub-agreements, including a Purchase Order, a Product Specification, APC's Standard Terms of Sale, a Purchase Agreement, and a Support Agreement.  Under certain provisions of the Specification and Support Agreement, APC promised to "support" the product through December 31, 2012; the meaning of these provisions is the primary topic of dispute.  1040 MOA Specification § 9.4; 1040 MOA Support Agreement §§ 11.1, 11.2. The Support Agreement also required APC to maintain "Data Warehouse Documents," consisting of intellectual property necessary for the production and repair of the displays; the Agreement obligated APC to turn over the Documents to Atlantech

---

[1]At the time, APC operated as a division of Universal.  APC became a separately-incorporated, wholly-owned subsidiary in June 2004.  APC Acquisition purchased APC's rights in all contracts and purchase orders in January 2007.

[2]Other agreements entered into in September 2003 (the "890 MOA") and in November 2006 (the "725 MOA") are not directly at issue here.

if APC discontinued the product.  1040 MOA Support Agreement
§ 7.1.2.  In the event of breach, § 14 of the Purchase Agreement
relieved APC from liability for consequential or indirect
damages.

APC stopped producing 1040-100 displays in 2004.  In
February 2006, Atlantech purchased about two hundred 1040-725
displays ("2006 Purchase Order"), anticipating that the 1040-725
displays would serve as "form, fit, and function replacements"
for the 1040-100 displays.  Atlantech purchased these units from
APC to satisfy its December 2005 agreement to sell 200 form, fit,
and function equivalents to UIMDB.

APC did not deliver any display units under the 2006
Purchase Order.  Atlantech did, however, receive fifteen 1040-725
units purchased under a separate November 2006 agreement with
APC, part of the so-called "725 MOA"; Atlantech delivered those
units to UIMDB.  Atlantech communicated with APC Acquisition
regarding malfunctioning 1040-725 displays into February 2007.

In April 2006, Atlantech filed an action in this district
against APC for breach of contract and negligent
misrepresentation, *Atlantech, Inc.* v. *American Panel Corp.*, No.
06-10699-JLT (D. Mass. filed Apr. 20, 2006), which Altantech
voluntarily dismissed later that year.  In January 2007, APC, APC
Acquisition, and Universal agreed among themselves not to sell
any further product to Atlantech without either a release of

liability, or the written consent of the parties.  Meanwhile, over the course of 2008 and 2009, APC Acquisition sold sixteen display units to Nexel, knowing that Nexel intended to develop business with UIMDB.

## B.   *Procedural History*

Atlantech filed its original complaint in this action in February 21, 2007, raising claims for breach of warranty, breach of support obligations for the 1040-100 displays under the 1040 MOA, breach of the 2006 Purchase Order, and negligent misrepresentation.  The next two iterations of the complaint added claims for breach of contract based on APC's failure to turn over Data Warehouse Documents, breach of support obligations with respect to 1040-725, 890-100, and 890-500 displays, and intentional interference with contractual relations.

In March 2008, Judge Tauro--who was previously assigned to this matter--granted partial summary judgment in favor of Atlantech on its claim for breach of the 1040 MOA, and entered an injunction requiring APC to turn over the 1040-100 Data Warehouse Documents.[3]

---

[3]Judge Tauro also entered judgment in favor of Atlantech, *Atlantech, Inc.* v. *American Panel Corp.*, No. 07-10342-JLT, Judgment (D. Mass. Mar. 24, 2008), effectively closing the case despite the presence of other unresolved claims and damages issues.  After several motions to re-open and appeal by Atlantech, in 2010 the First Circuit left the injunction in place, vacated the entry of judgment, and ordered further proceedings to resolve the remaining issues in the case. *Atlantech, Inc.* v. *American Panel Corp.*, Nos. 09-1726, 10-1180,

On October 1, 2010, Atlantech filed its Third Amended
Complaint, adding its claim for breach of the NCA.  A final
Fourth Amended Complaint followed on June 1, 2011.  This is the
operative pleading in this matter.

On June 10, 2011, I granted Defendants' motions for partial
summary judgment as to Atlantech's claims for breach of contract
regarding the Data Warehouse Documents (Count III), negligent
misrepresentation (Count V), and intentional interference with
contractual relations (Count VI).

At the conclusion of an eight-day trial, on June 22, 2011, I
indicated my intention to grant a directed verdict in favor of
Defendants as to breach of warranty (Count I), negligent
misrepresentation (Count V), and intentional interference with
contractual relations (Count VI), as well as portions of Count II
regarding breach of support obligations under yet another
purchase order not at issue here.

The jury then returned a verdict finding that Defendants
breached the 2006 Purchase Order and the NCA, awarding Atlantech
$1,070,456 and $26,010 in damages, respectively, for a total of
$1,096,466.[4]  The jury had apparently arrived at the damages
figure for breach of the 2006 Purchase Order by taking the value

---

Judgment (1st Cir. May 19, 2010).

[4]The jury also allowed for piercing of the corporate veil as
to Universal.

of Atlantech's contract with UIMDB ($2,770,00) and subtracting: the price of the 2006 Purchase Order ($1,335,750), the cost of the sale ($277,000), and the amount Atlantech received for separately delivering fifteen 1040-725 displays to UIMDB ($86,794).  This figure for lost profits matches the calculations offered by Atlantech President Nathan Bellin.  Damages for breach of the NCA were apparently based on the lost profits attributable to sale of three "APC 450" and three "APC 710" units from APC Acquisition to UIMDB through Nexel; the jury apparently refused to credit the lost profits on ten "APC 600" units.

On July 8, 2011, the parties filed a joint status report on the issues remaining to be resolved post-trial.  On July 29, Plaintiff moved for judgment as matter of law regarding the breach of Defendants' support obligations under the 1040 MOA.  I denied that motion and asked the parties "to frame this case for final resolution by means of summary judgment motions in the wake of trial and the record as it existed as of trial."

On May 23, 2012, Plaintiff filed the motion for summary judgment before me now, again regarding the issue of Defendants' support obligations under the 1040 MOA, as well as Plaintiff's entitlement to attorneys' fees under the NCA and to pre-judgment interest on all successful claims.  Defendants for their part moved for directed verdict, or for judgment notwithstanding the verdict, requesting that I construe the support obligations under

the 1040 MOA in their favor and that I deny Plaintiff any pre-judgment interest.  Defendants also seek reduction of damages for breach of the 2006 Purchase Order to $57,862.67.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  The question is whether there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

If a party has been fully heard on an issue during a jury trial, entry of judgment as a matter of law is appropriate under Fed. R. Civ. P. 50(a) when "viewing the evidence in the light most favorable to [the party opposing the motion, the court] find[s] that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there is only one verdict reasonable men could reach."  *United States* v. *Alcon Labs.*, 745 F.2d 105, 113 (1st Cir. 1984) (modification in original, internal quotations and citations omitted). Review of a motion for judgment notwithstanding the verdict "is similar if not identical: The motion is properly granted only when, as a

matter of law, no conclusion but one can be drawn." *Id.* (internal quotations and citations omitted).

### III. ANALYSIS

#### A. *1040 MOA Support Obligations*

Atlantech argues that the "support" provisions of the 1040 MOA required Defendants to make 1040-100 displays (or form, fit, and function replacements) available for purchase through 2012. According to Atlantech, Defendants breached that obligation, resulting in $2,051,840 of lost profits and $58,183 in mitigation damages. Defendants contest Atlantech's interpretation. APC Acquisition specifically claims that Atlantech's interpretation is foreclosed by the definition of "Product Support" in the agreement, and thus seeks a directed verdict in its favor on the claim for breach.

The parties agree that Georgia law governs construction of the 1040 MOA, based largely upon the choice of law provision in the Terms of Sale. 1040 MOA Terms of Sale § 12. Contract construction is a question of law for the court, Ga. Code Ann. § 13-2-1, and my task is to ascertain the intention of the parties, *id.* § 13-2-3 (2011). I must, of course, adhere to the terms of an agreement that is unambiguous on its face. *Id.*; *Zaglin* v. *Atlanta Army Navy Store, Inc.*, 622 S.E.2d 73, 75 (Ga. Ct. App. 2005). However, if the contract is ambiguous, "the court must apply the rules of contract construction to resolve

the ambiguity." *Michna* v. *Blue Cross & Blue Shield of Georgia, Inc.*, 653 S.E.2d 377, 379 (Ga. Ct. App. 2007).  These include rules allowing parol evidence to explain ambiguities in a contract, Ga. Code Ann. § 13-2-2(1), or giving credit to established trade or local usage of terms, *id.* § 13-2-2(2). "Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury." *Michna,* 653 S.E.2d at 379.

### 1.  Construction of Support Provisions

The 1040 MOA, in the Product Specification sub-agreement, provides:

> This product shall be supported by the manufacturer for a minimum period of 10 years starting in 2002. In the event that the Assembly is changed such that form, fit, or function, are affected, manufacturer will notify the buyer and end user in writing 60 days prior to such ch[a]nges. In the event that the part is obsoleted at the end of the 10 year period, the manufacturer will notify the buyer and end user with sufficient advanced warning (for example 120 days assuming a 4 month lead-time) to prevent factory or field interruption. The manufacturer will make available prior to obsolescence, either the identification of a suitable alternative, or the opportunity for a "life time buy" at pricing commensurate at the time of obsolescence, or both.

1040 MOA Specification § 9.4 [DE377-3 at 22].  In the Support Agreement, the 1040 MOA also provides:

> **11.1 Discontinuance of Products.** In the event Manufacturer discontinues production of any Product, Manufacturer will provide notification to Customer / End User one hundred eighty (180) calendar days before such discontinuance.

**11.2 Length of Product Availability.** Manufacturer agrees to support original product through December 31, 2012. At that point, the product may be discontinued. If so, the Customer / End User shall be notified 180 days in advance of the planned obsolescence, and shall be permitted to a "Life Time Buy" at prices in line with prior purchase orders.

1040 MOA Support Agreement §§ 11.1, 11.2 [DE 377-3 at 68].

At a pre-trial conference, I indicated that I interpreted the 1040 MOA to require that APC provide notice of planned obsolescence and fill further orders at a price in line with prior orders during the period between notice and obsolescence. Under that reading, Defendants did not breach their support obligations under the 1040 MOA. It was apparent Atlantech was aware that APC was discontinuing the 1040-100 displays in June 2004--based on Bellin's notification to UIMDB--and Atlantech placed no further orders until December 2005--well after a 120- or 180-day notice period.

According to APC Acquisition, "support" as used in section 9.4 of the Specification and section 11.2 of the Support Agreement is limited by the definition of "Product Support" in the Support agreement. The Support Agreement defines "Product Support" as "[a]ll services related to assisting Customer / End User or buyer in the **use** of any Product." 1040 MOA Support Agreement § 1 (emphasis added). This definition makes no mention of future sale or purchase of displays. At a minimum, however, the agreement contemplates additional sales only as necessary to

service product already in the field--an interpretation consistent with a plain reading of the word "support."

But the agreement remains ambiguous.  Under Section 11.2 of the Support Agreement, APC "agrees to support original product through December 31, 2012.  **At that point**, the product may be discontinued."  1040 MOA Support Agreement § 11.2 (emphasis added).  The implication is that APC agrees not to discontinue the product until after December 31, 2012.  The Specification similarly mentions obsolescence only "**at the end** of the 10 year period."  1040 MOA Specification § 9.4 (emphasis added).  These guarantees, combined with provision for a "life time buy," suggest that the contract was designed in part to allow Atlantech to satisfy future demand (*i.e.*, demand following obsolescence) through purchase of additional product.

Moreover, it is unclear whether the definition of "Product Support" applies to the relevant "support" provisions.  The use of "Product Support" in other sections of the Support Agreement is consistent with the phrasing and capitalization used in the Definitions section of the agreement.  *E.g.*, 1040 MOA Support Agreement §§ 2.1, 8.1.  The uses of "product shall be supported" in the Specification and "to support original product" in the Support Agreement are differently phrased and uncapitalized, indicating that the parties did not intend for those phrases to bear the same meaning as the defined term "Product Support."

I had been skeptical, as I told the parties at the pre-trial conference, that the 1040 MOA was intended to create a "free-floating obligation to continue to provide [a] particular product for a particular time." But the testimony of witnesses from both parties resolved the ambiguity in the support provisions of the 1040 MOA in favor of Atlantech. Representatives of the Defendants who spoke to this issue included Jim Niemczyk, VP of Business Development at APC Acquisition, Marsha Rivard, Director of Contracts at APC Acquisition, and Amy Neighbors, former APC Program Manager. These witnesses shared an understanding that APC would make the original product or a "form, fit, and function" replacement available to Atlantech for 10 years.

Niemczyk described the business model as follows:

> [W]e would sell a product to a customer, and then as technology changes, because it always does as components became obsolete, they always do, that we would offer to that customer when they placed a future purchase order that we would make that next generation unit basically a plug and play unit for the original unit.

Similarly, when counsel for Atlantech presented a hypothetical in which an existing customer wants to buy more product to build additional aircraft, Rivard said the contract "means they have the opportunity to come back and buy more." Bellin said he agreed with these characterizations of APC's contractual "support" obligations.

I credit the uncontested and consistent testimony at trial supporting Atlantech's interpretation of APC's support

obligations under the 1040 MOA.  The 1040 MOA did not require APC to produce or sell 1040-100 displays.  But, for 10 years, APC agreed to hold open the opportunity for Atlantech to buy form, fit, and function replacements.  That said, the 1040 MOA did not specify the price at which APC had to offer the replacement parts, except perhaps to the extent that the price needed to be roughly "in line" with prior orders.

### 2.  Enforceability

Defendants cursorily argue that, under Atlantech's reading, the 1040 MOA is an unenforceable "indefinite quantities contract," meaning "a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller." *Mason v. United States*, 615 F.2d 1343, 1346 n.5 (Ct. Cl. 1980).  Atlantech responds that the agreement is an enforceable "requirements contract," under which a buyer purchases from a seller quantities of products necessary for its operations.

The problem can be one of mutuality.  "[W]hen nothing in the purported agreement amounts to an obligation on the buyer's part to purchase any quantity beyond that already purchased, the purported agreement is unilateral and unenforceable for want of mutuality as to any unperformed portion thereof." *Billings Cottonseed, Inc.* v. *Albany Oil Mill, Inc.*, 328 S.E.2d 426, 430 (Ga. Ct. App. 1985).  However, a condition that the buyer

-13-

purchase his requirements exclusively from the seller creates the required mutuality.  *Id.* at 429.

To be sure, not all jurisdictions consider exclusivity a necessary feature of requirements contracts.  *E.g.*, *Hoover's Hatchery, Inc.* v. *Utgaard*, 447 N.W.2d 684, 688 (Iowa Ct. App. 1989).  But despite the implication otherwise in *Billings Cottonseed*, Ga. Code Ann. § 11-2-306 appears to recognize the possibility of non-exclusive requirements contracts.  Only § 11-2-306(2) mentions "exclusive dealing," while § 11-2-306(1) reads:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Ga. Code Ann. § 11-2-306(1).  Section 11-2-306(1) thus appears not to require exclusivity so long as an implied term of good faith is read into the contract.

In any event, the evidence at trial established that the 1040 MOA was at least analogous to an exclusive dealing agreement.  The 1040 MOA did not involve a fungible commodity. *Cf. Billings Cottonseed*, 328 S.E.2d at 428 (contract for cottonseed to be used as cattlefeed).  The 1040-100 displays were customized and available to Atlantech only through APC. Purchasing an alternative from another seller thus would have

been prohibitively expensive if not impossible.  The very nature of the promise to make 1040-100 or equivalent displays available for 10 years and provision for a "life time buy" reflects Atlantech's concern that it would not be able to obtain displays elsewhere.  Thus, although not formalized in the agreement, APC had some assurance that Atlantech would use APC to meet its demand for displays.  I thus find adequate mutuality to make the agreement enforceable even under the more restrictive view of requirements contracts as exclusive dealing agreements.

　　　3.　Anticipatory Repudiation

　　　Atlantech, however, has won the battle but not the war. Even having adopted Atlantech's extended view of the support obligations and finding the promises therein enforceable, I conclude that Atlantech is not entitled to further damages because it has failed to show that APC breached its support obligations.

　　　Atlantech relies on a theory of breach by "anticipatory repudiation," which occurs when one party "absolutely refuses to perform" or makes an "unqualified repudiation of the entire contract prior to the time for performance." *Textile Rubber & Chem. Co., Inc.* v. *Thermo-Flex Technologies, Inc.*, 687 S.E.2d 919, 922 (Ga. Ct. App. 2009).  Atlantech, however, attempts to demonstrate anticipatory repudiation by Defendants based on the January 2007 agreement among the Defendants not to sell any

further product to Atlantech without either a release of liability, or the written consent of the parties.

The January 2007 agreement does not establish anticipatory repudiation by the Defendants because there is nothing absolute or unqualified about it.  As I expressed to the parties during trial, even if APC held open the opportunity to purchase replacement parts, "[t]he price was subject to negotiation."  The January 2007 agreement merely requires the Defendants to make a release of liability a part of negotiations over price.  And even if Atlantech would not agree to a release, or insistence on a release made Defendants' negotiation unreasonable, the January 2007 agreement still did not constitute an absolute repudiation of support obligations, because it allowed for sale of product to Altantech upon consent of all the parties.

Atlantech says Defendants never offered it the "life time buy" required under the 1040 MOA.  But even if that provision applied outside of a notice period just prior to December 31, 2012, it only applied upon complete obsolescence of the product and functional replacements--which, again, the January 2007 agreement does not establish.

Atlantech also highlights that Niemczyk admitted at trial that Defendants did not sell additional displays to Atlantech after January 2007.  The absence of further sales, however, is not an unqualified refusal to sell.  Quite the contrary, Niemczyk

testified that he did not know how APC Acquisition would have handled orders from Atlantech purportedly made pursuant to the support provisions of the 1040 MOA.

Thus unable to show that Defendants breached their support obligations under the 1040 MOA by anticipatory repudiation, Atlantech is not entitled to the additional damages requested.[5]

### 4.  No Direct Damages

Even if Atlantech could establish a breach of the 1040 MOA support provisions, I would not be prepared to award its requested damages.  Atlantech bases its damages calculation on losses attributable to 448 displays--a figure reflecting the number of displays UIMDB allegedly would have purchased from Atlantech, based primarily on a statement of intent that UIMDB planned to buy 100 units per year.

Such damages, however, are precluded under § 14 of the Purchase Agreement, which relieved APC from liability for consequential or indirect damages.  Georgia law permits such limitations on liability.  Ga. Code Ann. 11-2-719(3).  Thus, as I instructed the jury, Atlantech was entitled only to "direct

---

[5]Judge Tauro's memorandum on summary judgment found breach of the 1040 MOA primarily based on APC's failure to turn over Data Warehouse Documents for the 1040-100 displays.  He also indicated in passing that discontinuation of the 1040-100 displays violated § 11.2 of the Support Agreement.  That finding, however, cannot be sustained given the understanding--now apparently undisputed by both parties--that the 1040 MOA allowed APC to satisfy its obligations not only by supporting 1040-100 displays but also form, fit, and function equivalents.  In any event, I decline to adopt Judge Tauro's finding in this regard.

damages," which could include lost profits "if those profits are necessarily inherent in the contract and represent the benefit of the bargain." *See Imaging Sys. Int'l, Inc.* v. *Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 127 (Ga. Ct. App. 1997).

The damages Atlantech now claims for breach of support obligations are different in kind from the damages awarded under the 2006 Purchase Order, which involved Atlantech's firm order of 200 units from APC to satisfy its contractual obligation to sell 200 units to UIMDB.  No reliable number of future sales to UIMDB Atlantech might make was established with corresponding purchases from APC.  There is nothing inherent in the bargain when the parties entered into the 1040 MOA in 2003 sufficient to provide reliable numbers, and this precludes Atlantech from recovering lost profits, Ga. Code Ann. § 11-2-715, or replacement costs, Ga. Code Ann. § 11-2-713, attributable to such speculative purchases and sales of displays.

I also cannot find that there was demand from UIMDB for thirty 1040-100 displays in early 2007, as Atlantech argues, because Atlantech has attempted to demonstrate such demand only through the inadmissible hearsay of its own employees rather than communications from UIMDB to Altantech (or others) confirming the demand.[6]

_____

[6]Atlantech is correct that it need not have engaged in the futile act of placing a formal purchase order following clear repudiation of "support" obligations by Defendants.  *Cf.*

-18-

**B.    Interest**

Atlantech seeks prejudgment interest on damages awarded by
the jury for breach of the 2006 Purchase Order and breach of the
NCA.[7]  Several issues are not in dispute.  Both sides premise
their arguments on Georgia law, which the parties reasonably
understand to govern their relationship in this regard.
Accordingly, the parties agree that the applicable rate of any
interest awarded is the Federal Reserve prime rate, currently
3.25%, plus 3%, for a total of 6.25%.  Ga. Code Ann. § 7-4-12.[8]
Finally, the parties agree that the request is one for interest
on unliquidated damages, meaning that "for interest to be
permitted . . . there must [have been] a monetary loss which
'immediately and necessarily' flow[ed] to the injured party."
*Malta Const. Co.* v. *Henningson, Durham & Richardson, Inc.*, 716 F.

---

*Restatement (Second) Contracts* § 255 cmt. a (1981).  But even if
Atlantech could establish breach without having engaged in such a
useless act, the contractual limitation on liability and need to
prove direct damages would still require Atlantech to provide
reliable evidence of its demand for displays--which, as already
discussed, Atlantech has not done.

[7]Atlantech also seeks interest on damages stemming from
Defendants' breach of their support obligations.  Having declined
to award such damages, the claim for interest as to those damages
is moot.

[8]For reasons undisclosed in the submissions, the parties
fail to address why the simple 7 percent figure from Ga. Code
Ann. § 7-4-2 would not be more appropriate.  *See Alphamed, Inc.*
v. *B. Braun Med., Inc.*, 367 F.3d 1280, 1287 (11th Cir. 2004)
("Section 7-4-2(a)(1)(A) fixes the legal rate of interest for
O.C.G.A. § 13-6-13 unliquidated contractual damages at seven
percent unless the contract provides otherwise.").

Supp. 1466, 1469 (N.D. Ga. 1989) (quoting *Norair Eng'g Corp.* v. *Saint Joseph's Hosp., Inc.*, 249 S.E.2d 642, 649 (Ga. Ct. App. 1978).

An award of interest on an unliquidated claim is discretionary. *See* Ga. Code Ann. § 13-6-13 ("In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery."). That act of discretion is typically one for the jury, *see Am. Family Life Assurance Co.* v. *U.S. Fire Co.*, 885 F.2d 826, 835-36 (11th Cir. 1989), except in the case of a bench trial where the judge operates as the finder of fact, *see Norair*, 249 S.E.2d at 649.

Defendants argue that Atlantech waived any right to prejudgment interest by failing to request that the issue be submitted to the jury. *See Kolb* v. *Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir. 1982) ("[P]laintiff did not request prejudgment interest from the jury. He was therefore barred from subsequently seeking it from the judge."); *Plantation Key Developers, Inc.* v. *Colonial Mortg. Co.*, 589 F.2d 164, 172 (5th Cir. 1979) ("If [Plaintiff] intended to seek pre-judgment interest, it was obligated to present that question to the jury as an element of damages."). In response, Atlantech attempts to characterize the verdict as a special verdict, whereby the court may make findings on issues not submitted to the jury. Fed. R. Civ. P. 49(a).

I agree with Defendants that Atlantech has waived any entitlement to prejudgment interest.  The parties engaged in extensive colloquy with me about the factual disputes to be resolved by the jury, which included the question of damages for breach of the 2006 Purchase Order and the NCA.  The jury was charged generally with determining damages attributable to breach of those agreements.  The issue of prejudgment interest was never raised by the parties.

The cases cited by Atlantech purporting to support an award prejudgment interest in these circumstances are inapposite. *Tobin* v. *Liberty Mut. Ins. Co.*, 553 F.3d 121 (1st Cir. 2009), for example, was a case in which plaintiff prevailed on federal and state civil rights claims where damages were not separated into federal and state components; in such circumstances, prejudgment interest to which the prevailing plaintiff is entitled under state law may be "added ministerially after the verdict, not factored into the jury calculus." *Foley* v. *City of Lowell*, 948 F.2d 10, 17 (1st Cir. 1991).  In *Holloway* v. *State Farm Fire & Cas. Co.*, 537 S.E.2d 121, 124 (Ga. Ct. App. 2000), both parties agreed to submit the issue of prejudgment interest to a special master.  Neither case provides an excuse for Atlantech's failure to request that the issue of prejudgment interest be submitted to the jury when the jury was charged generally with determining damages on its state law breach of contract claims.

**C.   Attorneys' Fees**

Atlantech also seeks attorneys' fees and expenses based on a provision of the NCA providing that "the 'Party' found in default [of the NCA] by a judgment shall compensate in full the aggrieved 'Party' for all it's [*sic*] legal expenses."  Because the claim for breach of the NCA was one of seven counts in this matter, Atlantech requests an award of one-seventh of the fees and expenses it incurred since it added the claim on October 1, 2010. During that time, Atlantech has incurred a total of $1,009,855.23 in attorneys' fees and $119,325.10 in expenses, thus placing its request for fees at $144,265.03 and expenses at $17,046.44.

Given that the fee provision is contractual, I apply the law of the state governing the contract, which the parties again appear reasonably to agree is Georgia law.  *Cf. In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4 (1st Cir. 2012). That said, without more specific guidance from the contract as to fees, I will assume the parties intended to incorporate the more developed general body of law on statutory attorneys' fees.  *Cf. Magnetic Resonance Plus, Inc.* v. *Imaging Sys. Int'l*, 543 S.E.2d 32, 35 (Ga. 2001) (construing contractual provision for award of attorneys' fees to "prevailing party" based on law interpreting that phrase as used in statutory fee provisions).

There is no dispute that the NCA entitles Atlantech to fees and expenses for prevailing on its claim for breach of the NCA.

The difficult question is what proportion of fees Atlantech incurred correspond to services performed in furtherance of the breach of NCA claim. *Cf. Hensley* v. *Eckerhart*, 461 U.S. 424, 440 (1983) ("[W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."). Defendants argue that Atlantech has provided nothing more than speculation about the appropriate fee award, and thus refusing to grant fees at all would be appropriate.

Setting a fee award typically begins with a determination of the lodestar, calculated by multiplying the number of hours reasonably worked by a reasonable hourly rate. *Lipsett* v. *Blanco*, 975 F.2d 934, 940-41 (1st Cir. 1992). Apportioning fees among multiple claims then involves an equitable judgment as to the amount attributable to plaintiff's success on the claim entitling it to fees. *Id.* Work performed on other claims may be credited if those claims included common facts or legal theories. *Id.* In the final analysis, however, "[w]here it would be an exercise in futility to separate out the legal services rendered for each claim, the fee should simply be determined as a function of degree of success." *Id.* That said, "[i]t is well established in [Georgia] that an award of attorney fees cannot be based upon guesswork or speculation." *Leon* v. *Monterrey Mexican Rest. of Wise, Inc.*, 699 S.E.2d 423, 428 (Ga. Ct. App. 2010).

Defendants generally do not take issue with Atlantech's lodestar, with the exception of ultimately futile discovery it conducted regarding units APC Acquisition may have sold through Nexel beyond those stipulated to by APC Acquisition.  I will not hold those additional discovery initiatives against Atlantech. It is, to be sure, troubling and unhelpful that Atlantech only provides a cumulative figure for work done since the claim for breach of the NCA was added, despite knowing it was the only claim that might yield fees.  Nevertheless, Atlantech's "one-seventh of total fees" calculation provides a serviceable and not unrealistic way to begin calibration of the proportion of services fairly attributable to its success on the claim for breach of the NCA, despite the fact that it exceeds Atlantech's overall degree of success on the only claim which provides fees and costs.

The NCA claim was based on a set of facts independent from the parties' other disputes about the terms of various agreements and purchase orders, the extent to which those agreements were satisfied, and the damages stemming from their breach.  The other claims in this case required exploration of the relationship among the parties for nearly five years.  Prosecuting the NCA claim was a discrete and, by comparison, less demanding endeavor--involving sales by APC Acquisition to UIMDB through Nexel over the course of about two years.  The modest amount of

trial testimony dedicated to the NCA claim also provides some indication of its relative importance and thus the amount of work reasonably dedicated to the claim.

Unable to apportion with mathematical precision the services performed, I turn to Atlantech's overall success, for which its "one-seventh" metric is a poor proxy.  In an award totaling $1,096,466, the jury awarded only $26,010 on the NCA claim. Although the measure is somewhat crude, I find the proportion of the total award attributable to the NCA claim--namely, 2.37%--to be the best available proxy for the degree to which Atlantech succeeded by prevailing on its NCA claim, the only claim entitling it to fees.

This allocation is in some ways analogous to apportionment of responsibility for a fee award among multiple defendants based on the portion of a damages award attributable to each defendant. *Cf. Torres-Rivera* v. *O'Neill-Cancel*, 524 F.3d 331, 338 (1st Cir. 2008).  Except in cases where litigating against a particular defendant is obviously more or less cumbersome, *see id.* (default judgment against one defendant), the relative liability of the defendants provides an adequate proxy for the fees reasonably associated with prosecuting a successful claim against each defendant.  So too here, albeit in an effort to apportion fees among claims rather than defendants.

Accordingly, I will award 2.37% of the fees and expenses incurred since October 1, 2010--placing the award at $23,933.57 in fees, and $2,828.01 in expenses.

### D.   *2006 Purchase Order*

Under the 2006 Purchase Order, Atlantech purchased 201 1040-725 displays, guaranteed compatible with 1040-100 displays, from APC for $1,335,750.  The agreement later provides:

> 25 units must be delivered before April 15, 2006.  If the 25 units are not or cannot be purchased, Atlantech is responsible for the raw material cost.  Remaining 175 unit materials on hold until confirmation of compatibility.

Whether out of generosity, ease of calculation, or the likelihood that Atlantech could establish direct damages only for units it was contractually bound to deliver to UIMDB, Atlantech ignores the 201 unit figure and measures Defendants' damages based on an obligation to deliver 200 displays.

As earlier discussed, the jury's $1,070,456 award reflected Atlantech's $1,157,250 gross profit on the contract, minus $86,794 in profits made by sale of 15 units to UIMDB.  In other words, the jury awarded lost profits on 185 undelivered units.

Defendants argue that they were obligated to deliver only 25 units because they never received a "confirmation of compatibility" from Atlantech--an undisputed fact established at trial.  Accordingly, Defendants request that I limit damages for breach of the 2006 Purchase Order to lost profits on only 10 undelivered units, measured at a profit of 5,785.26 per unit

($1,157,250 gross profit divided by 185 units), for a total of $57,862.67.

Although the 2006 Purchase Order put delivery on hold pending a confirmation of compatibility, nothing indicates that failure to provide a confirmation of compatibility relieved APC of its obligation to deliver.  Neither does the fact that Altantech bore the cost of raw materials for an initial round of incompatible displays indicate that Defendants were thereby freed of any further obligation to provide compatible displays. Rather, the provision for incremental delivery protected Defendants against a situation in which they produced the full number of displays (thus bearing the cost of production for a full 200 displays), and then also faced liability for breach if all those displays turned out to be incompatible with 1040-100 units.  Defendants cannot, however, transform this protection into absolution from their obligation to deliver the agreed 200 displays under the Purchase Order, by failing to deliver even the initial round of compatible displays.

There may have been some factual question before trial whether Atlantech proceeded to make a demand for undelivered compatible units.  The jury, however, resolved that issue in Atlantech's favor, given that the adequacy of demand made would not differ whether 10 or 185 units remained outstanding. Defendants do not challenge this point, and I will not in any

event disturb that finding of fact.  The evidence supports the inference that Defendants were aware Atlantech was still seeking delivery of the contracted-for displays.  The November 2006 "725 MOA," for example, included provision that the additional purchase did not waive the rights or obligations of either party under prior purchase orders. For her part, Rivard also testified that the 2006 Purchase Order was never canceled.

Accordingly, I refuse to disturb the award of damages for breach of the 2006 Purchase Order.

## IV. CONCLUSION

For the reasons set forth more fully above, Defendants are entitled to judgment as a matter of law that they did not breach their support obligations under the 1040 MOA.  Defendants are also entitled to judgment as a matter of law that Atlantech is not entitled to prejudgment interest.  Defendants are not entitled to a reduction of damages awarded by the jury for breach of the 2006 Purchase Order.  Atlantech is awarded $23,933.57 in fees and $2,828.01 in expenses for prevailing on its claim for breach of the NCA.

Accordingly, Atlantech's motion for summary judgment, Dkt. No. 368, is GRANTED IN PART and DENIED IN PART.  Defendants' motions for a directed verdict or, in the alternative, judgment notwithstanding the verdict, Dkt. Nos. 369, 374, are GRANTED IN

PART and DENIED IN PART.  Final Judgment shall enter in

accordance herewith.


                                   */s/ Douglas P. Woodlock*
                                   DOUGLAS P. WOODLOCK
                                   UNITED STATES DISTRICT